Now that we're conversant with the core of this patent, we'll hear the reverse appeal, Conversant Wireless Licensing v. Apple, involving the same patent, different claim limitations, and different references. Mr. Neruzzi. Thank you, Your Honor. Kayvon Neruzzi for Appellant Conversant, and may it please the Court. The issue in this appeal is that the Board made two significant errors in its final written decision in its approach to reaching the conclusion of unpatentability with respect to the 0201476 patents. First, the Board's decision relied on an implicit construction that equates the act of launching an application with a separate claim requirement that the application must have been in an unlaunched state. Second, the Board's stated motivation to combine failed to provide a reason for the actual modifications on which its unpatentability determination relies. I don't see below anywhere where you argued this unlaunched state point. You never presented to the Board that there was a need for a construction, right? We did not expressly ask for a construction, but we made arguments based on the meaning of unlaunched state. But wasn't that limited to the one dependent Claim 10? There are two patents at issue, so with the 476, it was not. It applied to all claims. In the 020 context, it came in the section of the brief discussing Claim 10, but Claim 10 depends from Claim 1, and Claim 10 has nothing further to say specifically about unlaunched state. It's not a modification on the unlaunched state limitation. So where does your unlaunched state argument show up for the 476? I just didn't see it at all. So we address this point in our reply brief. I saw that, but I couldn't find it below. So it is Appendix 417 to 19 and Appendix 2732. So with the 476, it's at Appendix 2732. Where? So starting in Appendix 2731, we argue Opposita would understand that the five new e-mails text shown in Figure 10 corresponds to the America Online website also shown in Figure 10. And then at 2732, right at the top, we say, assuming arguendo that the American Online website qualifies as an application, which patent owner denies, that application would be considered launched in Figure 10 because a window to the website is open and visible. And so that's the exact same argument that we're now making on appeal about unlaunched state and display. And so the argument below, both with respect to the 476 and the 020, was that the board and Apple were relying on Figure 10 of NASEN along with certain teachings in the text of NASEN. And yet there's no evidence based on either Figure 10 or the teachings of NASEN that the applications themselves that are, quote, launchable from NASEN's GUI menu were previously in an unlaunched state as the claims require. Okay. What does that have to do with the Schnarl-Arbuck combination? So this... This only relates to NASEN. This particular item about NASEN's Figure 10 is the reason that the board's decision as to NASEN should not be affirmed and should be reversed. We also, as you point out, have to address the Schnarl based on patentability finding. In that context, obviously, Apple had an argument based on Schnarl alone. As the panel already alluded to in the prior argument, that was rejected as inadequate. Ultimately, the board relied on a combination of Schnarl and Arbuck. In that context, first of all, they did not make an adequate finding that Schnarl teaches unlaunched state. But I want to focus right now on their failure as to the motivation to combine Schnarl and Arbuck. Because in that context... Okay. So but as to my original question, you pointed me to some place where you made this argument about unlaunched state as it relates to NASEN. But you have not pointed me to any place where you made it with respect to Schnarl and Arbuck. So you want to go to your argument on Schnarl. But the answer to my first question then is that you did not make this argument as it relates to Schnarl and Arbuck. Okay. Thank you. I now understand your question. So as it relates to Schnarl and Aberg or Schnarl itself, I did not see in the record an argument where the unlaunched state limitation in the context of Schnarl was expressly challenged. Our position on that is that issues that the board decides and passes upon below are right for appeal. Now, so to the extent that the court requires that we specifically challenge that limitation in the context of Schnarl, I don't see that in the record. Our position is that's still not waiver because it's an issue that was passed upon below. But what's important to note is that our appeal does not rise or fall on that issue. Because with respect to the Schnarl findings, we have a second and very, I believe, compelling argument as to the lack of an adequate motivation to combine to justify the full extent of the modification that the board needed to make to arrive at the claimed invention. Did you argue below that there were basically six steps in the modification that would need to occur? Your Honor, I want to actually address the six-step issue. It's actually irrelevant whether you call it six steps or one. So I just want to make clear that, again, our argument does not rest on whether you believe that it is six steps or three or two or one. What we are specifically saying in the point of the six-step illustration is to make very clear what it is that must be done and that the board found must be done to Schnarl to get it from the point where it does not meet the patent claims to the point where it would meet the patent claims. And specifically, that's very clearly illustrated in our reply brief visually, and I'll direct the court to our reply brief at page four, where we put out a before and after visual illustration of Schnarl's figure one. In its original configuration, Schnarl's GUI in figure two, actually, contains a message summary pane 206. Now, this message summary pane is not reachable directly from the application button bar 104, which is below it. So the board correctly found that what Apple was calling the summary window, which is the pane 206, can't be reached from the main menu application button bar 104. To remedy that, Apple had an alternative theory that the board did accept, a combination of Schnarl and Aberg, and as a part of that alternative theory, here's what had to be done. That menu, 206, had to be taken off of the home screen of Schnarl. It then had to be placed into a special menu as taught by Aberg. That special menu idea is simply the idea that you can put GUI items into a menu and place it anywhere in the hierarchy of the device. Then, specifically, and now whether you call this all one modification or six doesn't really matter. The point is that the motivation has to support all these changes. Then you have to take that menu that was removed from the screen, put it into the Aberg menu, and place that only and only into application button bar 104, because that's what they've called the main menu. If you don't put the menu that they've removed into application button bar 104, you cannot meet the claims. You have to do one more thing that the board found. You have to make sure that once the menu's been relocated into application button bar 104, when it is selected, it does not launch the underlying message center application. That's necessary to meet the unlaunched state requirement. That's very anomalous and idiosyncratic and illogical because every other button in application button bar 104 does launch the underlying application. The board recognized that the purpose of the application button bar 104 is to launch the underlying applications. In addition, there is already a button for the messages application in application button bar 104. There has to be some reason why a person of skill and the art would take that menu 206 off of the screen in Schnarl, which Schnarl says is there so that you know immediately what the messages are that you have, take that functionality away from the user, degrade the quality of the user experience, and then make sure you put the button right in this one place that will meet the claim limitations. But your position is not that the board didn't go through the exercise of finding a motivation to combine. You're simply disagreeing with all the board's conclusions. I mean, they found your arguments unpersuasive. They relied on Apple's expert. They made specific findings of fact with respect to motivation to combine. And you're just asking us to say that that you think it's more logical to make the opposite findings. Your Honor, I actually strongly disagree with that. And I think that our argument is very different than that. So what I am specifically urging the court to consider is that, yes, the board made a finding on a motivation to combine. We agree with that. And their finding was smaller screen size. But that motivation, the motivation to obtain smaller screen size, does not get, does not justify a person of skill and the art going from what Schnarl was to what the board needed Schnarl to become to meet the claim limitations. And so if you look at the law in KSR and active video and other cases about what the motivation to combine must be, it must be a motivation that compels the person or gets the person to arrange the prior art combinations, quote, in the way the claimed invention does. And having a smaller screen motivation, if one were even there, which we do disagree with, having a smaller screen motivation might be a reason for a person of skill and the art to take menu 206 off the home screen. Maybe. But it's not a reason to then put it into a button, an application button bar 104 specifically, and then make sure that if you select that button, the application does not launch. And so what we're saying is there's an inconsistency and inadequacy between the why that underlies the board's decision and the what it is that the modification would have been. The why does not justify the full extent of the changes necessary. Well, the board found that both of the references were addressed to solving problems with small screen displays. Right. That's true. Yes. And then it said that Auburn fills the gap that we've identified in general. So it did identify a gap in general, but it said that our Arbor did disclose how to fix that gap. And Apple's expert said one of skill in the art would have understood that. I don't I don't understand what the problem with the board decision is other than your disagreement with its factual conclusions. So the specific problem with the board's decision is this. Aberg, however we pronounce it, teaches a couple of things that the board relied on. One, it teaches a special dynamic menu that can contain anything you want in it. You can put any items you want. And in that sense, it's not really much of a teaching. I mean, everyone knows in the field of art of GUIs that you can populate the menu with what you want. Secondly, it teaches that that special dynamic menu can be placed anywhere in the hierarchy of the device's GUI menu. So in one embodiment, it's placed right at the top level in the main menu where if they had put if they had put it there, it would not meet the claim limitations because it wouldn't be reachable directly. But in other embodiments, it's placed in all kinds of other locations within the GUI. And out of all those possibilities, the board looked to the fact that Aberg teaches you could put it in a specific place and decided that a person of skill in the art would have put it in exactly the place necessary to arrive at the claim inventions. But there wasn't a rationale to support that choice of location that's so critical to the board's finding from among all the possibilities of locations where that menu could have gone. Counsel, you wanted to save some rebuttal time. You're well into it. You can continue or save it. Thank you, Your Honor. I'll just close my opening remarks by saying that Aberg teaching is that that dynamic menu could go anywhere. And our argument is the board lacked any reason why the menu would have been used in such a place that it would have been placed precisely in the location necessary to meet the claims, as opposed to the many other locations in the Schnarl GUI that it could have been placed into. And so that's why we say the result is hindsight bias and results-oriented. And I'll save the rest of my time unless there are further questions. We will do that, counsel. Mr. Hollowood, do you mind? May it please the Court. Of course, the board found that each of the challenge claims was unpatentable in light of each of the two references, Schnarl combined with Aberg, as well as Nason. So affirming on either of those would be sufficient. I'm happy to talk about Schnarl first because that's been the focus of the argument so far today. As Your Honor notes, there was no challenge below to whether Schnarl taught the unlaunched state, it's just not there anywhere. The suggestion that if it's passed upon, of course, it's passed upon very succinctly because it wasn't argued. But nonetheless, that allows them to make any argument they want on appeal. It's been rejected specifically in this Court's decision, the Google versus Simple Air case that we cite. And for good reason, especially when you have the kind of limited APA review under Chenery. So I'm going to move to the other limitation, the Reach Directly limitation. And I'm happy to start with appellant's page four of their reply brief because I think what it shows is how very little the board had to rely on Aberg to fill the gap, if you will, in Schnarl. What's your response to his last point, which is that he says that Aberg was so vague in terms of where you would put this functionality that to say, by definition, you would look at Aberg and then you would decide where to put it, that that's enough? So I think it's important to follow the board's logic. The board starts with how much Schnarl itself teaches about this, right? Because Schnarl teaches that its windows are customizable, including specifically collapsible. And the board cites that a couple of different times on page 827 and again on 834. So collapsible to a single call. Yes, exactly. And so effectively what's happening is you're taking a window that occupies, as you can see in the before picture on reply brief four, a significant part of this relatively small screen size in the start window, and you're collapsing it. And where are you going to collapse it to? Well, if you're going to collapse it, there are really only a couple of different choices where to collapse it. And one of those is to 104. Now, this court's case law on obviousness, when there's one of a couple of different choices, each of which is obvious, you don't have to prove that one of them would necessarily be better than the other. They're both going to be obvious to the person of ordinary skill. And in terms of why 104? Well, if we look at Aberg's figure three, and Aberg's figure three is reproduced in the epilee brief at page nine. It's also at appendix 1299. Aberg actually describes its special menu as at a same level, the top level, with phone book and settings. And main menu 104 in Schnorell has address book and settings. And so to put it at the same level as those two same functionality that Aberg already described would have been obvious. And in terms of, again, there's not a lot that Aberg teaches, but there's not a lot that it has to teach, because all that you need to do is take Schnorell's summary window, which is displayed while these are not launched. Again, that's not been challenged or wasn't challenged below. And take that summary window, collapse it down, as Schnorell talks about, and put it in 104. Well, that's basically just taking it from the very top level and moving it one level down. And that is explicitly what Aberg describes. Does Aberg really teach anything other than collapsing the summary window into a button, essentially? Well, what it says is that you can have a special menu. And the special menu is described as those things that you want to reach most conveniently. You want those to be the ones you get to. And that's why Schnorell put this on the start page, because you want to be able to see this. This is the stuff you want to see most conveniently. And Schnorell says, now, you can take that special menu with those most used things, and you could put it at the very top. And this is explicit at columns 7, lines 25 to 29. It can be a top-level menu or, quote, submenu of any top-level menu. So basically, it's just saying you can move it one level down, and that's what you have to do. That's all you have to do to Schnorell to make it precisely disclose what it is that's claimed in the claims at issue. So, again, the board, as Your Honor said before Judge O'Malley, says all this very explicitly. And then they answer the why question. Why would a proceeding have done this? They would have done it to solve the problem of small screens. And, again, I think the before and after picture on reply page 4 explains exactly why that is. You have a cluttered start screen with no room for anything else. And by simply collapsing that summary window into main menu 104 gives you what they say is, one, remove. That's now new real estate on a very small screen where real estate is very valuable to do something else with. That's what the board found that's very supportable. That's a new fact, substantial evidence review, well-supported. But I want to turn to NASEN because my colleague didn't actually mention that at all except in passing. And that is also well-supported. The board noted that in NASEN, NASEN explicitly says that when you click on one of the active buttons within the summary window, that launches the application. And the expert said that a PCETA would have understood from that that you can have the application in an unlaunched state to launch it when you click the button because that's explicitly what NASEN describes. Below and here, Conversant does not deal with that explicit textual disclosure in NASEN. That it is the pushing of the clicking of the button in the summary window that causes the application to launch. Can you just explain as an intuitive matter what I'm sure you'll appreciate is a little bit of an oddity. Why is there not a redundancy when you say launch something and by the way make sure that it's in an unlaunched state when you launch it? What's that by the way? How could that be meaningful? Well, first I just want to note that that argument of superfluity was not made below. But I don't think that the superfluity rule of construction is not an absolute rule. It's a canon of construction. Here we know why the limitation was added. It was because there was in the prosecution history and this is described in the LG case that your honor sat on the panel. Where there was another prior art reference called Richard. In Richard there was app A and app B. And both were displayed. But app A was the active window. And you would click on app B to make it the active window. But even before that they were both displayed. Now that had been relied on by the examiner as prior art to say that the claims were not patentable. And so they added the in an unlaunched state to write around that issue in Richard. But Richard and it's very explicit in this court's decision in the LG case. In Richard they were both displayed. And what's telling is that in the court's decision in LG they sort of use displayed, not displayed, launched, unlaunched. Those are opposites and they are synonymous or relatively. You can use them synonymously as they do in the decision. That was the only issue that actually the parties agreed below. And the board applied unlaunched state means not displayed. The only argument that Conversant made below was not to grapple with the explicit textual language of column 3. But to say, well, wait, there's this figure. There's this figure 10. And it shows the summary window. And it also shows in the display screen that the application has been launched. It's AOL. This is the America Online. Right. This is the America Online. Yes, AOL. And we explained in our reply brief, and the board cites the reply brief, that that's simply showing it at a later stage. After you've clicked the button, after you've launched the application. Now, this argument that they're making now that's trying to make it all more cumbersome was not made below. Now, there is a kind of analogous issue that's presented with Claims 2 and 8, which use a different word. They use the word open. And the board, in its discussion of those claims, points to the fact that in Mason, Figure 5 shows the same summary window with nothing on the screen behind it. And then in Figure 6, it shows the same summary window with Lycos opened. You've clicked the button. You've launched it. First, it's unlaunched. And the second, it's launched, i.e., displayed. Now, Conversion says, don't look at Figure 5. Don't look at Figure 5 because the board didn't rely on it. And I agree. The board didn't rely on it. They didn't rely on it because these were not the issues as they were framed before the board. And this is why waiver matters. You have to look only at the arguments that were made to the board and the board addressed them. The only argument they made before is Figure 10 shows it as being displayed. Figure 10 is not even cited in the text of Mason. Figure 10 can't detract from what Mason's text in Column 3 already discloses, which is that it is the selection of the active button. It says mouse down, mouse up. That launches the application. And then they rely, the board relies on Dr. Meyer's testimony, that a PCETA would have understood that if it's the clicking of the button that launches the application, to make the application in an unlaunched state before that. But the board also, with respect to Mason, relied on Figure 9, which I didn't really understand. Figure 9 lays out in a graphical representation the cylinders, if you will. It kind of unrolls them. And there's no display there that's shown. It doesn't show any display. It doesn't show anything. If you go to Figure 11, it also shows the canister. That actually shows the whole frame and it shows nothing behind it. I think what they were pointing to is that the canister itself simply shows the window, it's the summary window, the buttons that can be pushed. It doesn't require that anything else be launched or displayed. That's why they pointed to Figure 9. I don't think it was a significant reliance on Figure 9. I think it's really the text of Column 3 that they're relying on. And again, we're not relying on Figure 5 and Figure 6, but they are so explicit in showing the summary window without the application behind it and then with the application behind it after you've launched the application. The board pointed to that where this issue was actually kind of engaged in the sort of open language of Claims 2 and 8. They would have relied on the same had this been how the argument was framed below. So it's really either of these two is sufficient to render the claims obvious. With respect to Nason, I do want to underscore that it was only with respect to Claim 10 of the 020 and then the 476 patents that even the unlaunched state was raised. And I also want to point out that in Schnurell, the fact that they didn't challenge it at all is it self-telling. Because in Schnurell as well, the disclosure in Schnurell is that it's clicking the active facts button that launches the application that was relied on by the board as showing that it was previously in an unlaunched state. They didn't even contest that with respect to Schnurell. And for good reason. That's what's intuitive. That's what Dr. Myers testified to. And in Nason, it's the same thing. They simply pick on the fact that there's this one figure that happens to show it after you push the button, after the application has been launched to somehow detract from the teachings of Nason's explicit disclosures in the text. That's not the right way to read patents. There's no requirement that the board do so. It was substantial evidence. If there are no further questions. Thank you. Thank you, counsel. We have some time remaining. Not much. A minute and a quarter. Thank you, Your Honor. Your Honor, let me start where my colleague left off. We do not pick on the fact that figure 10 of Nason happens to show exactly that Nason in that embodiment doesn't meet unlaunched state. What we're doing with figure 10 is we're saying to meet unlaunched state, there's something more that's required than simply showing that you can press a button to launch an application. Because if the application were already launched in another or different view, if it were in the background, if it were just sitting there minimized, if in any of those instances, clicking a button to launch an application that's already been launched would not meet unlaunched state. Figure 10 is an example of a situation like that that Nason teaches. The Richard app A app B example is another example of a situation like that that's even more telling where the size of app B that's shown is very small, but nonetheless it's launched. And we explained that during the prosecution history and argued it in the last core wireless appeal. And I think the panel agreed with us as can be seen from their decision. In Nason, there is no evidence, and the board made no finding as to whether the applications that can be launched were ever previously in an unlaunched state. The board simply reaches that conclusion because it's what's necessary to find unpatentability, but there's no actual evidence underlying it. With respect to Schnarl and Aberg, it was very interesting what counsel for Apple described that the process is exactly what's wrong with the board's decision. His description was you could collapse a menu in Schnarl, that's a possibility, and then you could put it in application button bar 104. Fine. Why would you do it? And would somebody have done it? The mere fact that these are things that could be done is not a sufficient basis to find unpatentability, and there are many reasons why someone would not have been motivated to take those steps. And Arctic Cat and AIT versus RPX, which we cite, tell us that the board has to consider reasons that detract from a motivation to combine, not only reasons that support it. The board did not do that here, and respectfully we ask for reversal or at a minimum remand for further consideration, unless there are further questions. Thank you, counsel. We will take the case on revising.